UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-1(b)

DOUGLAS G. LENEY (DL9012)
ARCHER & GREINER, P.C.
One Centennial Square
Haddonfield, NJ 08033
Tel: (215) 963-3300
Fax: (215) 963-9999
dleney@archerlaw.com
*Attorneys for Hightstown Enterprises, LLC*

In re:

3P HIGHTSTOWN, LLC,

      Debtor.

Chapter 11

Case No. 21-12957 (MBK)

**Hearing Date(s): June 3, 2021 @ 11:30AM;**
    **July 1, 2021 @ 11:00AM**

## SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF MOTION OF HIGHTSTOWN ENTERPRISES, LLC TO DISMISS CHAPTER 11 CASE

Hightstown Enterprises, LLC ("Hightstown Enterprises"), by and through its undersigned counsel, hereby submits this supplemental brief in further support of its motion to dismiss the above-captioned chapter 11 bankruptcy case for lack of authority (the "Motion"), and in support thereof, respectfully avers as follows:

### I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[1]

1. On April 20, 2021, Hightstown Enterprises, as sole preferred equity holder of the Debtor, filed the instant Motion, seeking the Court's entry of an Order dismissing the above-captioned chapter 11 bankruptcy case for lack of corporate authority and in violation of the Debtor's own LLC Agreement.

---

[1] The factual recitations as set forth in Hightstown Enterprises' Motion and Reply are incorporated herein by reference as if set forth at length. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion and/or Reply, as appropriate context may require.

2. On May 25, 2021, the Debtor filed its opposition ("Opposition") to the Motion.

3. On June 2, 2021, Hightstown Enterprises filed its Reply to the Opposition and in further support of the Motion.

4. The Court conducted a hearing on the Motion on June 3, 2021 (the "Hearing"). During the Hearing, the Court, *sua sponte*, raised an issue not raised in the Opposition relating to what the Court framed as a public policy concern and whether private parties could contract to place restrictions or prerequisites upon an entity's filing of a voluntary bankruptcy petition:

> THE COURT: One of the issues the Court is struggling with is the public policy issue relevant to requiring consent in order to file the bankruptcy. I'll point you all to a case that goes back about five years, *In re Intervention Energy Holdings, LLC* and the cite for that -- this is 553 B.R. 258 out of Delaware. And there's been a host of cases that come down on different sides of the issue but in In re Intervention Energy Holdings, LLC the bankruptcy court for the District of Delaware addressed the issue of whether a Delaware LLC lacked authority to file a Chapter 11 petition under the Code because the LLC agreement required the consent of all members and one member did not consent to the filing and the Court said it has been said many times and in many ways pre-petition agreements purporting to interfere with a debtor's rights under the Bankruptcy Code are not enforceable.

See, Tr. of Hearing, pp. 17-18.[2]

5. The Court then asked the parties to submit additional briefing solely with respect to that public policy consideration and whether and to what extent it impacts the Debtor's ability to unilaterally have commenced this Bankruptcy Case without the consent of its preferred equity class:

> THE COURT: By the 18th I want submissions on each parties' respective views as to whether the public policy implications should impact the Court's ruling on whether or not the debtor maintained the authority to file the bankruptcy in the first place.

See, Tr. of Hearing, p. 32.

---

[2] A copy of the transcript from the Hearing is attached hereto as Exhibit "A."

2

6.  For the reasons set forth herein, the case of In re Intervention Energy Holdings, LLC, 553 B.R. 258 (Bankr. D. Del. 2016) ("Intervention Energy") is distinguishable on its particular facts from the present scenario, and any public policy concern over a prospective waiver of bankruptcy rights is limited to those situations involving an imbalance in bargaining power, often times referred to as a creditor's "golden share" blocking rights, which is not at all like the issues present here.

## II. LEGAL ARGUMENT

7.  As previously set forth in the Motion, "[s]tate law determines who has authority to institute a bankruptcy proceeding on behalf of a legal entity, and 'where authority under local law is found lacking, the court has no alternative but to dismiss the petition.'" In re Cabernet Holdings, LLC, No. Civ. A. 10-50602C-11W, 2010 WL 2540116, at *2 (Bankr. M.D.N.C. June 21, 2010) (citations omitted). See also, Matter of Giggles Rest., Inc., 103 B.R. 549, 553 (Bankr. D.N.J. 1989) ("In determining who has the authority to file a voluntary petition in bankruptcy, it is clear that this power to file is governed by state law."). ***Notably, an agreement among LLC members limiting the power of an LLC to file bankruptcy has expressly been held to be valid.*** See, In re NNN 123 North Wacker, LLC, 510 B.R. 854 (Bankr. N.D. Ill. 2014) (citing In re DB Capital Holdings, LLC, 463 B.R. 142, 2010 WL 4925811 at *3 (10th Cir. BAP, Dec. 6, 2010)); In re Orchard at Hansen Park, LLC, 347 B.R. 822, 826 (Bankr. N.D. Tex. 2006) (same); In re Marino, 2010 WL 519772 (Bankr. S.D. Tex. 2010) (dismissing chapter 11 petition due, in part, to "questionable" corporate authority to file petition); In re Alpha Centauri Co., Inc., 2006 WL 4452827, *3 (Bankr. D.N.J. 2006) (dismissing chapter 11 case for lack of corporate authority to file).

8.  And Delaware limited liability companies, such as 3P Hightstown, "are designed to afford the maximum amount of freedom of contract, private ordering and flexibility to the

3

parties involved." In re Grupo Dos Chiles, LLC, No. Civ. A. 1447-N, 2006 WL 668443, at *2 (Del. Ch. Mar. 10, 2006); see also, Kyle v. Apollomax, LLC, 987 F. Supp. 2d 519, 524 (D. Del. 2013) (Andrews, J.) (holding that "Delaware's Limited Liability Company Act places a premium on the parties' freedom of contract.").

9. Sophisticated parties' freedom to contract among themselves is a pivotal element, if not the touchstone, of such relationships under Delaware law. Discussing the availability of specifically contracted-for protections (i.e., the availability of an adequate remedy at law) in the context of determining not to extend derivative standing to creditors of an LLC, the Supreme Court of Delaware has observed as follows:

> [The creditor] could have negotiated its remedies by contract. It did not. Instead, it chose to lend on what later turned out to be unfavorable terms. [The creditor] could have negotiated a contractual remedy at law that would not require the equitable extension of derivative standing even if the Court of Chancery had the requisite jurisdiction to do so. For example, [the creditor] could have negotiated for a provision that would convert its interests to that of an "assignee" in the event of insolvency. Or, it could have negotiated for a term that would give [the creditor] control of the LLC's governing body in such an event. These are but two examples.

CML V, LLC v. Bax, 28 A.3d 1037, 1046 (Del. 2011).

10. In Intervention Energy, the case offered by the Court as the basis for its potential concern over public policy considerations, the bankruptcy court there used what it considered a public policy consideration in order to refuse to enforce the express terms of a limited liability company agreement, even though it was arguably permitted by state law. See, Intervention Energy, 553 B.R. at 265-66. But all courts, including those which have ultimately overruled the express terms of contract between parties in the name of alleged "public policy concerns," must nevertheless conduct a fact-intensive and fact-specific inquiry.

4

11. The facts of Intervention Energy were quite different than those present here. In that case, the debtor's prepetition senior secured lender ("EIG") had called a default under a credit facility in excess of $100 million. In connection with the forbearance arrangement that ultimately resulted from such default, EIG demanded – among other onerous provisions which lenders in such situations often seek, such as a waiver of all claims by the borrower – the following:

> The Administrative Agent shall have received a fully executed amendment to the limited liability company agreement of the Parent in form and substance satisfactory to the Administrative Agent *(i) admitting EIG or its Affiliate as a member of the Parent with one common unit* and (ii) amending such limited liability company agreement to require approval of each holder of common units of the Parent prior to any voluntary filing for bankruptcy protection for the Parent of the Company.

See, Intervention Energy, 553 B.R. at 261 (emphasis added). The common unit issued to EIG cost EIG consideration totaling $1.00. Id.

12. The court in Intervention Energy identified such transaction and contractual obligation as "an advance agreement to waive the benefits conferred by the bankruptcy laws" and therefore, found the provision to be void as against federal public policy. "The federal public policy to be guarded here is to assure access to the right of a person, including a business entity, to seek federal bankruptcy relief as authorized by the Constitution and enacted by Congress." Id. at 265. The court also highlighted that the primary relationship of the creditor-turned-minority-equity-holder was as a creditor who owed no duty to anyone but itself in connection with the LLC's decision to seek bankruptcy relief.

13. In other words, EIG, which, prior to the forbearance agreement with the debtor was not an equity holder of the debtor, but rather solely one of its largest creditors, demanded a single unit of common equity as a means of clearly being able to "block" any future bankruptcy

5

filing by the debtor. This tactic, which has been observed in numerous other lender/borrower relationships and has been the subject of much case law weighing the policy considerations at issue, has become what is known as a "golden share" arrangement. See, e.g., In re Lake Michigan Beach Pottawattamie Resort LLC, 547 B.R. 899 (Bankr. N.D. Ill. 2016) (refusing to enforce a provision in an operating agreement, *provided after the debtor/borrower had defaulted on a loan*, giving the creditor the power to block a bankruptcy filing in the form of a "golden share") (emphasis added).

14.     The scenario presently before this Court is much more like the case of In re Franchise Services of North America, Inc. ("Franchise Services"), in which the United States Court of Appeals for the Fifth Circuit held that "federal bankruptcy law *does not prevent a bona fide equity holder from exercising its voting rights to prevent the corporation from filing a voluntary bankruptcy petition just because it also holds a debt owed by the corporation …*" Franchise Services, 891 F.3d 198 (5th Cir. 2018) (emphasis added).

15.     In Franchise Services, the debtor rental car company ("FSNA") had purchased Advantage-Rent-A-Car from the Hertz Corporation prior to the commencement of the operative chapter 11 case. Id. at 204. Macquarie Capital assisted with FSNA's purchase of Advantage for a fee by creating a wholly owned subsidiary, Boketo, LLC ("Boketo"), to finance the transaction. Id. Boketo then invested $15 million in FSNA in exchange for 100% ownership of FSNA's preferred stock and a new certificate of incorporation with a consent provision that required approval from both the preferred stockholders and common stockholders prior to commencing a case under the Bankruptcy Code. Thereafter, FSNA filed its voluntary bankruptcy petition without requesting or securing the consent of a majority of its preferred and common shareholders. The Fifth Circuit specifically factually distinguished Intervention Energy and held

6

that "blocking" provisions that may be void because of public policy when exercised by purely self-interested creditors were nevertheless valid as consent provisions when exercised by actual shareholders.

16. Indeed, courts have acknowledged the difference between a contractual *waiver* of Constitutional bankruptcy rights (i.e., a waiver contained outside of the organizational documents) and a simple bargained-for contractual prerequisite as to the *corporate authority to file*, in the LLC context, with courts having expressly approved the latter. See, e.g., In re Global Ship Systems, LLC, 391 B.R. 193, 204 (Bankr. S.D. Ga. 2007) ("To accord full effect to Georgia's legislative determination that LLCs should be granted extremely broad discretion in the organization and the management of their affairs, I conclude that Drawbridge retained a separate right, as an equity holder, to refuse to consent to the filing of a voluntary bankruptcy case."); In re Squire Court Partners Limited P'ship, 574 B.R. 701, 707 (E.D. Ark. 2017) (restriction requiring limited partners consent to file voluntary bankruptcy petition allowed). "It is one thing to look past corporate governance documents and the structure of a corporation when a creditor has negotiated authority to veto a debtor's decision to file a bankruptcy petition; it is quite another to ignore those documents when the owners retain for themselves the decision whether to file bankruptcy." Id. at 708.

17. Much like in the Franchise Services case, here the numbers plainly tell the story. In Franchise Services, the court astutely noted that "[i]t strains credulity to believe that Macquarie made a $15 million equity investment just to hedge against the possibility that FSNA might not pay a $3 million bill." Franchise Services, 891 F.3d at 204. Here, in the case of the 4J Group (Hightstown Enterprises' predecessor in interest), the 11 enumerated items in Section 4.06(b) of the LLC Agreement – *only one of which pertains to a bankruptcy filing by the*

7

*Debtor* – were the negotiated product of $500,000 in capital contributions to the Debtor for preferred equity interests (*at a time when 3P Equity Capital's total equity in the Debtor was only half of that at $250,000!*).  The 4J Group was not some aggrieved lender seeking to maximize its own protections for a prior investment that had defaulted or otherwise gone bad; rather, the 4J Group's equity buy-in was solicited by and negotiated with Christopher Otteau as part of his (ultimately unsuccessful) bid to raise capital required for the joint venture as part of 3PRC, LLC and was the holder of two-thirds (2/3) of the total equity dollars invested in the Debtor.

18.    While it is true that the 4J Group also ultimately loaned a total of $125,000 to the Debtor (in subordinated financing, no less), that amounts to merely 25% of the 4J Group's bona fide, capital investment in the Debtor.  If Hightstown Enterprises – like the 4J Group before it – is said to be wearing "two hats" as both a creditor and a bona fide equity interest holder, then those two hats are far from equal.  Rather, its equity holder hat plainly dwarfs its subordinated creditor hat.

19.    Therefore, the public policy concern raised by this Court and examined by <u>Intervention Energy</u> and certain cases like it should ***not restrict*** the enforceability of the plain and unambiguous language of the LLC Agreement requiring the solicitation of votes on the issue of commencing bankruptcy proceedings.  To do so would effectively take *two* competing public policy considerations – one, the issue of enforceability of prerequisites on the filing of a bankruptcy case, and the other, Delaware's well-settled and world-renowned deference to sophisticated parties' ability to contract freely among themselves – and arbitrarily place the former above the latter.  Such a result is unwarranted, and could have massive unforeseen consequences on matters on internal corporate governance going forward.

20.     The Court should have no reservations, stemming from public policy or otherwise, about dismissing this chapter 11 case.  This case clearly falls more in line with those cases like <u>In re NNN 123 North Wacker, LLC</u>, <u>In re Orchard at Hansen Park, LLC</u>, and <u>Franchise Services</u>, discussed above, wherein courts recognized that the negotiated terms of a limited liability agreement were to be given "teeth," and that they were binding on all members.  This is not a "golden share" case in any sense of the term, and the public policy implications considered by the <u>Intervention Energy</u> court are simply not present here.

### III. CONCLUSION

WHEREFORE, for the reasons set forth hereinabove, as well as in the Motion and in the Reply previously filed with the Court, Hightstown Enterprises respectfully seeks entry of an Order dismissing the above-captioned chapter 11 case, and granting such other and further relief as this Court deems just and proper.

Dated: Haddonfield, New Jersey
       June 18, 2021

ARCHER & GREINER
A Professional Corporation

 /s/ Douglas G. Leney
Douglas G. Leney (NJ Bar # 034232007)
Christopher R. Gibson (NJ Bar # 029861985)
One Centennial Square
Haddonfield, NJ  08033
Tel:  (856) 795-2121
Fax:  (856) 795-0574
dleney@archerlaw.com
cgibson@archerlaw.com
*Attorneys for Hightstown Enterprises, LLC*

221423309v1